Filed 2/10/23 Hopping v. Oppenheim CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN HOPPING AND LAURA JANSSEN, Petitioners and Appellants, v. DANA OPPENHEIM AND RACHEL A. HERBERT, Respondents. | A165030; A165031 (Alameda County Super. Ct. Nos. HF21108063; HF21108068; HF21111114; HF21111115) |

Appellants John Hopping and Laura Janssen each filed two separate requests for elder abuse restraining orders seeking protection against respondents Dana Oppenheim and Rachel Herbert. Following a hearing where the court heard from five witnesses, the court issued a comprehensive order denying all requests, concluding among other things that appellants failed to meet their "burden of proof necessary for an elder abuse restraining order." We affirm.

## BACKGROUND

**The Parties and the General Setting**

Appellants John Hopping and Laura Janssen (when referred to collectively, appellants) are husband and wife, aged 78 and 72 respectively.

1

They live in a home on 63rd Street in Oakland, which they bought in 1989. Stephanie Hopping, Hopping's adult daughter, also lives in the home with her husband, William Nootens.

Respondent Rachel Herbert is the owner of the property next door to appellants' home, a property she purchased in 2016. Respondent Dana Oppenheim also lives there and as described at the hearing, together they operate five businesses and have a young child. (When referred to collectively, Herbert and Oppenheim will be called respondents.)

**The Proceedings Below**

On August 6, 2021 Janssen filed two requests for elder abuse restraining orders (see Welfare and Institutions Code section 15657.03). One named Herbert is the person from whom protection was sought; the other named Oppenheim. In the section entitled "Description of Abuse," in response to a question asking, "what happened," Janssen wrote: "there are now 12 (twelve) cameras looking at us from all angles. The OPD (Oakland Police Dept.) was here (8 officers) who all agreed [my] privacy was openly invaded (and [am] currently [suffering] mental abuse with resulting physical symptoms. [The] person making abuse accusations had (and is currently experiencing) physical symptoms secondary to the mental abuse she has suffered."

On August 27, Hopping filed his own two requests for restraining orders, similar to those filed by Janssen. In his description as to "what happened," he entered this: "the neighbors have camera surveillance of my home (cameras pointed at windows) yard—also audio recording, in effect— prying on our privacy." And in a section that asked whether he was "abused at other times," Hopping wrote: "[respondent] had an eight-foot-high spite wall fence that deprived us of long-standing sunlight. Ostentatious in size

2

and design—this added to the tension of being surveilled.  Other forms of abuse have been financial in terms of cost of litigation and the overt waste of time—and sheer disturbance to our household."

On November 5, on behalf of Janssen, there was filed what was called "Ex Parte Application For Order For Preliminary Injunction."

On November 10 respondents filed their opposition to the ex parte order.

On January 12, respondents filed their response to the four requests for elder abuse restraining orders.  The response included a declaration signed by both respondents, which among other things included a lengthy description of some history between the two properties, particularly involving Nootens, Stephanie Hopping's husband—a history that resulted in a mediation agreement signed by Nootens and Herbert and their attorneys.  The response also included 14 exhibits, all authenticated by respondents, one of which was the mediation agreement.

The next day—the day set for the hearing—there was filed on behalf of appellants a pleading that can only be called incredible.  It was two pages long, entitled "Motion For Summary Judgment On The Pleadings," signed by Ms. Gottschalk who identified herself as "Amicus in favor of Petitioners."  The motion had no date for any hearing and read in its entirety as follows:

"MOTION FOR SUMMARY JUDGMENT ON THE PLEADINGS

"Knowing that Karla Gottschalk, Attorney at Law, will be required to be a witness to the agreement (Exhibit B) submitted with respondents untimely response emailed at 4:57 PM on 1/11/22 of over 500 pages, Petitioners hereby and through special appearance by counselor Gottschalk, request Judicial Notice of the proceedings before Hon. K. Schwartz (Exhibit C) and in support of Summary Judgment for Petitioners John Hopping and

3

Laura Janssen against Rachel Herbert and Dana Oppenheim for the following reasons:

"1) The aforesaid frivolous and unfounded general denial or [*sic*] Petitioners['] claims by **Respondents Identified above Admits** the 10 (Ten) surveillance cameras previously alleged as Penal Code violations by Petitioners and the Exhibits D and continuing [to] show the time date and view of several instances of criminal surveillance.

"The Court must Order the immediate removal of the unpermitted surveillance cameras, Grant the permanent restraining order against the respondents Herbert and Oppenheim and declare that Janssen is over 67 years old, Hopping is over 67 years old and Gottschalk is over 67 years old and are all elders according to statutory terms and have been unduly abused and caused financial hardship, humiliation, pain and suffering.

"Damages are calculated as follows:

| "John Hopping survey and | $400,000.00 includes alternate housing |
|---|---|
| "Laura Janssen health problems | $400,000.00 abuse leading to severe |
| "Stephanie Hopping suffering | $400,000.00 Invasion of privacy, pain, and |
| "Dr. William Nootens abuse of process | $1,300,000.00 Malicious prosecution |

"Breach of Court mediated agreement per terms of agreement and cease and desist letter of 1

"$1000.00 per day since Oct. 19, 2019. ~ $800,000.00

"Gottschalk                                    $500,000.00 against Lvovich & Sczucsko, P.C. as partners and individually for with full knowledge of the

4

situation requiring counsel to come to California and spend months on a case where defense is unmeritorious and brought to oppress elder neighbors and defamation of Gottschalk as an officer if [*sic*] the court.

"Submitted in court 1/13/22 to court clerk and opposing counsel for Respondents Terry Sczucsko for Lvovich & Sczucsko, P.C[.]

"Dated 1/13/22                      Karla Gottschalk SBN 91651."

**The Hearing**

The requests for restraining orders came on for hearing on January 13, before the Honorable Kelli Evans. Appellants were present, along with Ms. Gottschalk, who described herself as "amicus" and represented that she was appearing only on the "motion for summary judgment." Respondents were represented by Lisa Pinelli of Lvovich & Sczucsko, P.C. The hearing lasted well over an hour, during which Judge Evans heard from five witnesses, three on behalf of appellants and two on behalf of respondents.

The hearing began with Judge Evans referring to the motion for order to show cause, and asking Janssen "what is the basis for that." Janssen responded "surveillance cameras looking directly at our home," which Judge Evans then confirmed with Janssen was the "central justification" for the petition for restraining order as well.

Then, after confirming that Janssen was the main spokesperson for herself and Hopping, Judge Evans asked: "So please tell me—I've read all of the materials—I've read all of the materials that the parties have filed in association with today's petition; but I'd like to hear from you briefly, why you believe that there should be a restraining order against the respondents?"

Janssen replied, "Because of the cameras. They are looking directly at our home." Judge Evans then asked, "And how do you know they are looking

directly at your home?" Janssen answered, "Because we can see them pointed—I live upstairs. So the people that they're pointing at live downstairs. They are our tenants." Judge Evans replied, "Okay. So you're saying that the respondents have cameras that are pointed in the direction of your tenants' home . . . is that the gist of it?" Janssen answered, "Yes."

Janssen then testified that one of the cameras was pointed at the attic, and that there was a camera in the back that could see into the corner of their property. Judge Evans asked Janssen how she knew what the cameras were able to capture, and whether she had ever seen footage from them. Janssen answered, "I don't recall personally, but I'm sure that they are pointed at our downstairs tenants . . . and there's one high up. There's one really high up. It looks into our house."

Judge Evans then invited Janssen to provide any other information she had about the cameras, to which she responded, "They have been up there since . . . . They got a restraining order—they got a—what was that agreement?" Judge Evans noted, "I've looked at a copy of the agreement, and my understanding is that it was only in place from 2019 to 2020. And the agreement—I've looked at a copy of [it]—the agreement did not prohibit the use of cameras."

Janssen testified that the previous July she found nails in her tires. Asked by Judge Evans whether she had any evidence that the nails were put there by respondents, Janssen said "No, I don't."

The next witness was Stephanie Hopping. She began by admitting she had no evidence that respondents had placed nails under their tires, further acknowledging that construction workers had been in the vicinity and that the nails were large construction nails. Stephanie Hopping testified she had seen video footage or still footage from the cameras, but what she offered

Judge Evans were only photographs of the cameras themselves. And, when she tried to refer to some prior judge who had ordered that the cameras be taken down, Judge Evans replied, "I want to know what's happening now. I don't want to know what was happening in 2019."

Respondents' position began with their counsel, Ms. Pinelli, pointing to the photographs showing that some of the "cameras" appellants were complaining about were actually just lights, and that the actual cameras were not pointed at appellants' property. Herbert then testified, offering testimony about the photographs showing what each camera recorded. She also testified that they had five working cameras (and four non-working cameras), none of which was pointed at appellants' property.

Respondents then called Thomas Santos, who had installed the cameras. Santos testified to the kind of cameras and that he had installed five of them. Santos then presented live footage from the cameras, and testified that none of the cameras was recording appellants' property. Santos then testified about the lights shown in appellants' photographs, that it was the infrared light on the camera that was used when it became dark.[1] The decision Judge Evans would later enter described Santos's testimony at length, a portion of which we quote here: "In support of their position, [respondents] provided the court with still photographs taken from the video feed of each of the cameras. Additionally, the individual who installed the cameras testified as a witness for Respondents. This witness testified about the functionality of the cameras, including that, contrary to Petitioners' claim, they do not record audio. The witness also testified that the cameras are not recording the Petitioners' property. This witness provided the court

---

[1] Judge Evans looked at a feed from the camera at night, and noted that no portion of appellants' home was visible.

7

with a live video feed from each of the operational cameras. The still photos and live video feeds showed different areas of the Respondents' property and of the public street. None of the photographs or video feeds showed the outside or inside of Petitioners' property."

At that point, Stephanie Hopping interjected, and represented that there was a zoom camera facing appellants' yard, particularly the kitchen and bathroom area. Asked by Judge Evans how she knew it was operational, she said "I've witnessed . . . Rachel [Herbert] moving them even closer so she could get a better view into—from her door. She was moving them right about three or four feet from my window. There's another one that they are claiming to be a light, that has a hidden recording device. And then there's one also in their back house." Then asked by Judge Evans how she knew there was a hidden recording device, she testified, "Well, because it has a camera lens on top of the light."

Following that, Judge Evans provided Ms. Gottschalk the opportunity to argue the motion. The argument lasted for all of nine lines, where Ms. Gottschalk said, "They have admitted the cameras. And they have them not on all sides of their house, but only on the side facing the petitioners and the front on the street. It's obvious that they have admitted to the criminal activity that's been going on for over two years and caused extreme and severe damages to the elders, particularly Laura Janssen . . . . And there should be a permanent injunction issued immediately so that they can live in their home."

Ms. Pinelli, counsel for respondents, responded, pointing to the evidence presented from respondents' side, and the lack of evidence from appellants.

Given another opportunity to speak, Janssen said: "My question for everybody is why the need for cameras in the first place? We have dogs that live outside. And when anybody comes near the property, they bark. So that's just my question, why do they need cameras in the first place?"

Hopping, speaking for the first time at the hearing (other than being sworn), said that there was a breach of confidentiality as to the prior agreement, which disgusted him. He pointed to a police incident report where an officer had observed the cameras, and then testified that a fence was installed on his property, and that a camera was then installed 20 feet up in the air by respondents. Hopping pointed to photographs and then requested "an agreement that any type of harassment, any type of bullying of my daughter, ceases; and if it does occur again, that it will be registered as a criminal act, okay." Judge Evans then gave Hopping a chance to explain the photographs taken by his daughter Stephanie and he testified they were pictures of various cameras.

Finally, Santos gave Judge Evans the model numbers for the cameras, and the matter was taken under submission.

**The Decision**

On January 14, Judge Evans filed her written order denying the requests for restraining orders. It began with several paragraphs describing the various filings leading to the hearing. It then noted that "Respondents acknowledged having installed security cameras on the outside of their home. Respondents testified that they have five operational security cameras on their home and several other cameras mounted that have been inoperable for months. Respondents denied that the cameras were used for any purpose other than for the safety of their family. They also denied that the cameras

9

were directed at or otherwise recording footage of the outside or inside of Petitioners' home."

Following description of Santos's testimony, the order discussed the nails in the tires, and the lack of evidence that respondents had anything to do with that. The order then referred to the mediation agreement, and ended with these three paragraphs:

"Based on the testimony, evidence, briefing, and arguments presented by the parties and their counsel, the court DENIES Petitioners' requests for Elder Abuse restraining orders, Petitioners' request for a preliminary injunction requiring Respondents to remove the security cameras, motion for order to show cause, motion for sanctions, and motion for judgment on the pleadings.

"Welfare & Institutions Code section 15657.03 allows the court to restrain any person for the purpose of preventing a recurrence of abuse if a declaration shows reasonable proof of a past act or acts of abuse of the petitioning elder or dependent adult. Unlike the civil harassment statute which requires the court to find clear and convincing evidence that unlawful harassment exists ([Code Civ. Proc. §] 527.6[, subd.] (d)), the court may grant an elder abuse restraining order on a preponderance of the evidence. (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131.)

"While the court believes that Petitioners have a genuine belief that Respondents' security cameras are recording their actions, Petitioners have not met the burden of proof necessary for an elder abuse restraining order. The court does not find a preponderance of evidence of a past act of elder abuse. The overwhelming weight of the evidence presented to the court showed that respondents' cameras, while visible from Petitioners' yard and home, are not recording the inside or outside of Petitioners' home. Simply

10

because the cameras can be seen from Petitioners' home does not mean that the cameras are pointed at or are recording Petitioners' home or their movements. The court found the testimony and other evidence presented by the witness who installed Respondents' cameras to be highly credible. This witness presented evidence, including live video feeds from each of the cameras, clearly showing that none of the cameras are capturing Petitioners' home or movements. While respondents do not have the right to subject Petitioners to surveillance, the court finds that such surveillance is not occurring. Respondents have the right to maintain security cameras for the safety of their family. With respect to the nail in the tires allegation, Petitioners acknowledge that they did not have any evidence that Respondents were responsible for the nails. Regarding the allegation that Respondents sometimes park in front of Petitioners' home, it is not unlawful to park on a public street."

**The Aftermath**

With Judge Evans's decision, one would think that the matter was over in the trial court—a matter that, however significant it was to the parties, might accurately be described as ordinary or routine. But it quickly developed it was not that, and no adjective is adequate to describe the flurry of activity that followed in the next few months, activity caused by the pleadings, motions, and other papers filed by Ms. Gottschalk. And as to what it entailed; we quote from appellants' opening brief (all citations omitted):

"On January 26, 2022, Janssen and Hopping filed [*sic*] Motion for New Trial/JNOV; Motion to Compel Responses to Form Interrogatories, Special Interrogatories Set No. One (1), Requests for Production of Documents & Electronically Stored Information (ESI) Set No. One (1); Adverse Inference Sanctions and Monetary Sanctions; Objection to Defendants' Late Filed

Response; Motion to Strike Accomplice Testimony of Thomas J. Santos and Supporting Declarations [Citations]. Respondents did not oppose Petitioners' motions, the Superior court did not set a hearing on Petitioners' motions and the Superior court did not grant nor deny Petitioners' motions. This appeal followed."[2]

"On March 21, . . . over a week after the Superior court published and provided to Respondents the confidential financial information of Janssen & Hopping in an egregious breach of confidentiality [citations], Respondents filed Motion for Order Granting Prevailing Party Attorney's Fees [Citations]. The Superior court immediately scheduled a hearing on Respondents' motion for May 10, 2022.

"On May 9, . . . [Appellants] filed Verified Statement of Disqualification of Judge Kelli Evans; Verified Objection of Petitioners Laura Janssen & John Hopping to Hearing Before Judge Kelli Evans; and supporting declarations [citation]. After a hearing, the court took the matters under submission [citation]. Following the immediate denial of Petitioners' judicial challenge for cause by the challenged judge, dated May 11, 2022, Janssen & Hopping filed a petition for a writ of mandate. This Court summarily denied that by order with no written opinion [citation]. Sixty-six (66) days after the Superior court took Respondents' attorney's fees motion under submission, the Superior court issued an order denying Respondents' motion, without prejudice [citation]."

---

[2] One appeal was filed on March 14, on behalf of Janssen.

## DISCUSSION

### Introduction and Observations About Appellants' Brief

Appellants have filed a 68-page "Appellants' Opening Brief [First Amended.]"[3]  The table of contents lists five arguments, though the last three are mere statements, with no real argument attached.  And it is a brief that, as described below, violates various rules of court, is in disregard of settled principles of appellate review, bases claimed arguments on inappropriate matter, fails to support arguments with any meaningful analysis, and, perhaps worst of all, makes scurrilous comments about Judge Evans.  The brief is, in two words, most improper.

We begin our criticism with the fact that the brief lists on its cover that it was prepared by John Hopping and Laura Janssen Pro per and "Karla Gottschalk Amicus for Petitioners," and that the brief was signed by three people:  "John Hopping Petitioner & Appellant, Laura Janssen Petitioner & Appellant, and Karla Gottschalk Amicus Counsel Supporting Petitioners."

Amicus curiae briefs may be filed in the court of appeal only with express permission from the presiding justice.  (Cal. Rules of Court, rule 8.200(c)(1).)  And amicus curiae applicants must file with the appellate court clerk an application for permission to file the brief, which application must include:  (1) a statement of "the applicant's interest"; and (2) an explanation of "how the proposed amicus curiae brief will assist the court in deciding the matter."  (Cal. Rules of Court, rule 8.200(c)(2).)  In short, if one wants to file an amicus brief in this court, they are to file a request for such, which request can be granted or denied at the court's discretion.

---

[3] The reason for the "First Amended" is that appellants' original opening brief was rejected because it did not comply with the Rules of Court.

This was generally explained by our clerk's office to Ms. Gottschalk at the time she attempted to file the original appellants' opening brief. She responded that she did not want to proceed in accordance with the rules, but that she wanted to assist her "friends," and thus she wrote the brief on their behalf. The second brief was submitted and filed electronically.

Given Ms. Gottschalk's representation, our comments about the brief are thus directed at her, a member of the California Bar, which comments begin with the observation that appellants' brief has a claimed "Statement of Facts" that states "all of the facts in this narrative are drawn from the parties' separate statements and evidence cited therein." We do not understand there were any "separate statements" involved here, and the pertinent facts are those that were before Judge Evans.

But beyond that, the claimed "facts" are set forth completely from the standpoint of appellants, with page after page of quotations from the declarations of appellants. This is most inappropriate, as we described in *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, which we quote, with minor edits to comport with the setting here.

"California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall '[p]rovide a summary of the significant facts . . . .' And the leading California appellate practice guide instructs about this: 'Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations, and/or material omissions of the relevant facts or law can instantly "undo" an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!' (Eisenberg et al., Cal. Practice Guide: Civil Appeals

14

and Writs (The Rutter Group 2010) ¶ 9:27, p. 9-8 (rev. #1, 2010), italics omitted.) [Appellants'] brief . . . ignores such instruction.

"[Appellants'] brief also ignores the precept that all evidence must be viewed most favorably to [respondents] and in support of the order. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) This precept is equally applicable here, where Judge [Evans] issued a [written order]: . . . [A]ny conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)

"What [appellants] attempt here is merely to reargue the 'facts' as [they] would have them, an argumentative presentation that not only violates the rules noted above, but also disregards the admonition that [they are] not to 'merely reassert [their] position at . . . trial.' (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687; accord, *Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 773.) In sum, [appellants'] brief manifests a treatment of the record that disregards the most fundamental rules of appellate review. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 365, 368, 421–424, pp. 425–426.) As Justice Mosk well put it, such 'factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail.' (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399.)" (*In re Marriage of Davenport, supra,* 194 Cal.App.4th at p. 1531.)

And were all that not enough, many of the items appellants refer to as claimed "facts" were made in connection with their motion for new trial, not in their original requests for restraining orders or their testimony at the

hearing. They were thus not before Judge Evans at the time she decided the case, and are not proper for consideration here. (See *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [appellate court considers only matters that were part of the record at the time court entered the judgment].)

Finally, we note that the brief makes various unsubstantiated representations, including, for instance, that Judge Evans ignored "years of . . . criminal threats, intimidation, and vandalism." No evidence was presented of criminal threats, intimidation, or vandalism (except perhaps the unsubstantiated claim about nails in their tires, as to which appellants admitted they had no evidence of respondents' involvement.) The brief also makes gratuitous statements that malign various individuals, illustrated by referring to all three contractors who did work for respondents as "unlicensed." And the brief has an "addendum" that consists of six pages that include state and federal records relating to Herbert's restaurant, and in various footnotes the brief refers to "criminal misconduct" and "unlawful" business operations, and alleged improper receipt of Covid-related funds. None of the references find support in the record. (See *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 453 [factual assertions attributed to sources outside the record disregarded].)

**The Denial of the Requests for Restraining Orders Was Correct**

***The Law and the Standard of Review***

" 'Abuse of an elder' is defined as '[p]hysical abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering.' (§ 15610.07, subd. (a).). . . 'Mental suffering' is defined as 'fear, agitation, confusion, severe depression, or other forms of serious emotional distress that is brought about by forms of

16

intimidating behavior, threats, [or] harassment . . . .' (§ 15610.53.)"
(*Bookout v. Nielsen, supra,* 155 Cal.App.4th at p. 1141.)

Appellants' requests were focused essentially on their claim that respondents' security cameras were recording their home. At the hearing, the only evidence they had were photographs of the cameras, and admitted they did not know what the cameras recorded. And having read all the papers and hearing from appellants, Judge Evans ruled against them, in a comprehensive order concluding that the evidence showed that respondents' cameras, while visible from petitioners' home, were not recording appellants' home. That finding is amply supported here, perhaps most especially by the testimony of Mr. Santos, the witness who installed the cameras, whose testimony Judge Evans found highly credible. Thus, Judge Evans denied the requests, finding among other things that appellants failed to meet their "burden of proof necessary for an elder abuse restraining order."

As appellants' brief acknowledges, we review Judge Evans's ruling for an abuse of discretion. (*Bookout v. Nielson, supra,* 155 Cal.App.4th at p. 1137.) As to what a showing of such abuse requires, it has been described in terms of a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920), or one that is arbitrary, capricious, patently absurd, or even whimsical. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 [" ' "arbitrary, capricious, or patently absurd" ' "]; *People v. Benavides* (2005) 35 Cal.4th 69, 88 [ruling " ' "falls 'outside the bounds of reason' " ' "]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614 ["arbitrary, whimsical, or capricious'].) In its observation on the subject in one leading case, our Supreme Court said that "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon*

*Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  Or as that court put it in its most recent definition, "arbitrary or irrational."  (*In re White* (2020) 9 Cal.5th 455, 470.)

Those adjectives hardly describe Judge Evans's ruling here.

Indeed, appellants' brief fails to address the significance of Judge Evans's finding that they failed to meet their burden of proof.  In light of this, appellants have a particularly heavy, perhaps insurmountable, burden on appeal, as set forth, for example, in *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic*):  " 'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528[, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.4th 989, 1010].)"

One relatively recent case described the burden imposed by *Sonic* this way:  " ' "[w]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor.  That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof.  [Citations.]  We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." ' [Citation.]  'The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to

the prevailing party and in support of the judgment. [Citation.] ' "All conflicts, therefore, must be resolved in favor of the respondent.' [Citation.]" [Citation.]' [Citation.]" (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067.)

Appellants have demonstrated no abuse of discretion, let alone that the evidence compels a ruling in their favor.

Eschewing any reference to Judge Evans's four-page order, early in their brief appellants assert that she denied their requests "on two erroneous bases," that the court ruled (1) "that because the abuse was not occurring on the date of the hearing, January 13, 2022, Petitioners had not met their burden of proof . . .";[4] and (2) "the court also ruled that the additional protection sought by the elder Petitioners to protect not only themselves, but also named members of their family, could not take place." One looks in vain in Judge Evans's order for either of these claimed "bases." And appellants' arguments fare no better.

Appellants' first argument is "The Denial of a Permanent Elder Abuse Restraining Order is Subject to Review and any Doubts Must be Resolved in the Elders' Favor." The rule is contrary, as the most fundamental principle of appellate review is that a ruling is presumed to be correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) All "intendments and presumptions are indulged to support it" and error must be affirmatively shown. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

---

[4] In an attempt to discredit Judge Evans's decision, appellants mischaracterize her statement that she did not want to know "what was happening in 2019." That statement was in direct reference to appellants' attempt to bring up statements by a prior judge in a different case, ultimately resolved by the mediation agreement.

Appellants' lengthy second argument[5] has two sub-parts, the first of which asserts that "Abuse of Discretion, Specifically by Judicial Officer Kelli Evans—Substantial Evidence Does Not Support the Trial Court's Factual Findings." This is followed immediately by four sub-sub-arguments that various "Affidavits in Support of Elder Abuse Restraining Order Protections Presented Reasonable Proof of Past Acts of Abuse"; going on to cite to affidavits of Hopping, Janssen, Stephanie Hopping, and "More Affidavits."

Maybe the affidavits presented "reasonable proof." Maybe they didn't. After considering all the evidence, Judge Evans found as she did, and held as she did, concluding that appellants' "evidence" did not demonstrate abuse.

Appellants' second sub-argument, labelled "B," is "Abuse of process by respondents . . . and their counsel of record . . . jointly and severally and repeatedly to 'lawfare' elders." Passing over that the three items complained of were not improper, the items are not within the showing required for the tort of "abuse of process," which has two essential elements: "(1) defendant [has] an ulterior motive in using the process and (2) committed a willful act in a wrongful manner." (*Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782, 792; see CACI No. 1520.) As explained by one Court of Appeal, " 'The common law tort of abuse of process arises when one uses the court's process for a purpose other than that for which the process was designed. [Citations.]' " (*S.A. v. Maiden* (2014) 229 Cal.App.4th 27, 41.) The three items of which appellants complain, however their inaccuracy, have nothing to do with "abuse of process."

---

[5] The actual argument reads: "The Trial Court Applied Incorrectly an Unfounded Burden of Proof Despite Substantial Evidence That the More Likely Than Not Standard and Not a Criminal Standard or Clear and Convincing Standard—The Elder Abuse Restraining Order Standard of Proof Was Met."

Appellants' final three arguments read as follows: "(3) Irregularities in the proceedings—13 January 2022 hearing"; "(4) Motion for summary judgment—13 January 2022 hearing"; and "(5) "Summary of irregularities between trial judge Evans and respondents' counsel Pinelli—13 January 2022 hearing."

What is in the brief under each of these three headings is brief indeed, and contains no cogent argument. Again, Eisenberg is apt: "Appellant's burden also includes the obligation to present *argument and legal authority* on *each point* raised. This requires more than simply stating a bare assertion that the judgment, or part of it, is erroneous and leaving it to the appellate court to figure out why; it is not the appellate court's role to construct theories or arguments that would undermine the judgment and defeat the presumption of correctness. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 C[al.]A[pp.]5th 506, 565 . . . .)" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 8.17.1, italics omitted.) In short, when appellants assert a point but fail to support it with reasoned argument and citations to authority, like here, we may treat it as waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

But while the "arguments" warrant no discussion as arguments, the references in the brief to Judge Evans do. At one point appellants' brief says, "now we turn to the abuse of discretion that was legion by Kelli Evans," going on to assert that "the elders" should have been granted a permanent restraining order—because there is "reasonable proof of past acts despite the Judge's collusion with Pinelli and her clients to render a judgment in Respondents['] favor and cause further elder abuse, mental suffering and to defame the amicus attorney . . . ." The brief also accuses Judge Evans of

21

"disallowing any cross-exam," and propounding "leading questions to Respondents," both criticisms made without record reference.

Appellants' response brief is no better. Among other things, it refers, again without reference, to "the right to cross-examination that was not afforded," and then asserts that "it was clear that the [*sic*] Judge Evans had already prejudged the matter and was guiding the testimony of the Respondents." Finally, under a section entitled "Trial De Novo," the response brief asserts that "New Judge Evans should have let an unbiased Judge decide appellants' challenge to her bias."

As the Court of Appeal described in *In re S.C.* (2006) 138 Cal.App.4th 396, 422: " 'Disparaging the trial judge is a tactic that is not taken lightly by a reviewing court. Counsel better make sure he or she has the facts right before venturing into such dangerous territory because it is contemptuous for an attorney to make the unsupported assertion that the judge was 'act[ing] out of bias toward a party.' (*In re White* (2004) 121 Cal.App.4th 1453, 1578.)"

## DISPOSITION

The order denying the restraining orders is affirmed. Respondents shall recover their costs on appeal.

22

_____

Richman, J.


We concur:


_____

Stewart, P.J.


_____

Markman, J. *


*Hopping v. Oppenheim* (A165030; A165031)

     *Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.